7 F.3d 223
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
GEORGETOWN STEEL CORPORATION, Plaintiff-Appellant,
and
UNION CARBIDE CORPORATION, Defendant-Appellant,
v.
LAW ENGINEERING TESTING COMPANY, Defendant-Appellee,
and
PITTSBURGH TESTING LABORATORY, INC., Defendant.
 No. 92-2588.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 8, 1993.
Decided: September 14, 1993.
 
 Appeal from the United States District Court for the District of South Carolina, at Charleston. Falcon B. Hawkins, Chief District Judge. (CA-85-440-2-1)
 Argued: Charles Porter, McNair & Sanford, P.A., Columbia, South Carolina; Thomas S. Tisdale, Jr., Young, Clement, Rivers & Tisdale, Charleston, South Carolina, for Appellant.
 Robert O. Fleming, Jr., Smith & Fleming, Atlanta, Georgia, for Appellee.
 On Brief: E. Russell Jeter, Jr., P. Michael Duffy, James B. Moore, Jr., McNair & Sanford, P.A., Columbia, South Carolina; Stephen P. Groves, Young, Clement, Rivers & Tisdale, Charleston, South Carolina, for Appellant.
 D.S.C.
 REVERSED AND REMANDED.
 Before RUSSELL, WIDENER, and HALL, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Georgetown Steel Corporation (Georgetown) and Union Carbide Corporation (Carbide) appeal an order of the district court, on remand from this court, entering a judgment for $50,000 in favor of Georgetown and nothing for Carbide against defendant Law Engineering Testing Company (Law).
 
 I.
 
 2
 Georgetown operates a steel mill in South Carolina. In the steelmaking process, Georgetown uses liquid oxygen and nitrogen, which it purchases from Carbide. In 1979, Georgetown decided that it would be more economical to have the liquid nitrogen and oxygen manufactured on site rather than delivered by truck. It leased a site at the mill to Carbide for the latter to construct and operate a cryogenic air separation plant.
 
 
 3
 As part of the Georgetown/Carbide contract, Georgetown was responsible for securing soil analysis and preparation of the site. Georgetown retained defendant Law to perform the soil analysis, and Carbide furnished drawings of the plant and equipment layout for Law's use.
 
 
 4
 A waste by-product of Georgetown's operations is steel slag, which contains heavy metals, lime, and various other organic and inorganic material. Georgetown had used the slag for fill at various other places at the millsite, and had done so more frequently just before the Carbide plant construction, based largely on a report by Pittsburgh Testing Laboratory that Georgetown's slag did not swell when hydrated. This report had been commissioned because Georgetown's plant engineer, Steve Rishel, had heard of an incident where expanding slag had destroyed a swimming pool.
 
 
 5
 In investigating the proposed plant site, Law discovered that it was already filled with slag, soil, concrete, and other debris. Law's report, dated March 24, 1980, proposed three viable methods of site preparation: (1) compacting the existing fill to eliminate voids, (2) removing the existing fill and replacing it with clean compacted sand, or (3) driving piles. Law did not believe that piles were essential, because shallow foundations would be adequate to carry the proposed loads, and had included the third alternative only because Georgetown had specifically requested that it determine the feasibility of piles.
 
 
 6
 Carbide officials contacted Stephen Blevins, Law's chief soils engineer, directly. Carbide emphasized that the plant's machinery would be quite sensitive and could safely tolerate only minimal differential settlement. In response, Law issued a new report, dated August 29, 1980, which recommended removal of the existing fill and replacement with clean sand.
 
 
 7
 Georgetown then asked Blevins whether pure slag could be used instead of sand. Though he knew that the slag contained lime and heavy metals, Blevins approved the use of slag without further inquiry, so long as it was ground into an aggregate with a grain size similar to sand's. At the time, engineers at one of Law's other corporate offices knew that some slags were unsuitable for fill. Before construction of the plant began, Georgetown's Rishel gave another Law engineer, Fred Sharpe, a copy of the Pittsburgh Testing report. Sharpe and Blevins discussed the report and pondered why it had been commissioned, but they did not investigate.
 
 
 8
 The rest of the story is easily told. The plant was built on slag. The slag soon hydrated and expanded.[1] The floors of the plant began to heave, and the stresses exerted on the piping and high-voltage electric wiring made the plant dangerous. In 1985, it was razed.
 
 
 9
 Georgetown filed this suit against Pittsburgh Testing and Law for damages[2] and against Carbide for a declaratory judgment as to their respective rights and responsibilities. Carbide filed a counterclaim against Georgetown and cross-claims against Law and Pittsburgh Testing. Carbide and Georgetown settled their claims against one another, and, though it is yet a nominal party-plaintiff, Carbide has assigned any recovery it may obtain in this action to Georgetown.
 
 
 10
 After a bench trial, the district court awarded Georgetown $3,233 against Pittsburgh Testing for damage to a track scale. All other claims against Pittsburgh Testing were barred by Georgetown's contributory negligence. The court further held that determining the expansiveness of the slag was not within the scope of Law's duties to Georgetown, in contract or in tort, and so found for Law. All of Carbide's claims were denied.
 
 
 11
 On appeal, we affirmed the judgments relating to Pittsburgh Testing, but reversed the negligence and breach of warranty judgments for Law. Georgetown Steel Corp. v. Union Carbide Corp., No. 88-2884 (4th Cir. Dec. 15, 1989), cert. denied, 497 U.S. 1004 (1990). We held that Law had been negligent and had breached its express and implied warranties to Georgetown in approving the use of slag without testing it. Though we recognized that Georgetown's employee Rishel had been negligent in not communicating his knowledge of the expansiveness of some slags to Law, we held that this negligence was not a proximate cause of Georgetown's damage and hence did not bar Georgetown from recovery. Finally, we held that Georgetown was not Carbide's agent and that the denial of Carbide's claims, which had rested on the same grounds as those against Georgetown, would also have to be reversed.
 
 
 12
 On remand, the district court entered judgment for Georgetown on the negligence and breach of warranty claims, but limited Georgetown's damages to $50,000 as provided in the parties' contract. Georgetown Steel Corp. v. Union Carbide Corp., 806 F. Supp. 74 (D.S.C. 1992). In addition, the court held that Law owed no duty of care in tort and had made no express or implied warranty to Carbide, and so again denied Carbide any recovery.
 
 
 13
 Georgetown and Carbide appeal.
 
 II.
 
 14
 The contract between Georgetown and Law expressly incorporated, through a handwritten insertion initialed by the parties' signatories, a page of "General Conditions" proposed by Law. One of these conditions states:
 
 
 15
 WARRANTY AND LIMITATION OF LIABILITY-The only warranty or guarantee made by Law Engineering Testing Company in connection with the services performed hereunder, is that we will use that degree of care and skill ordinarily exercised under similar conditions by reputable members of our profession practicing in the same or similar locality. No other warranty, express or implied, is made or intended by our proposal for consulting services or by our furnishing oral or written reports.
 
 
 16
 Our liability for any damage on account of any error, omission or other professional negligence will be limited to a sum not to exceed $50,000.00 or our fee, whichever is greater. In the event the client does not wish to limit our professional liability to this sum, we agree to waive this limitation upon receiving client's written request, and agreement by the client to pay additional consideration of 4% of our total fee or $200.00 whichever is greater.
 
 
 17
 These paragraphs could hardly be clearer, and, if they are enforceable, Georgetown's recovery was properly limited to $50,000.
 
 
 18
 In South Carolina, exculpatory clauses are disfavored because they tend to induce a want of care. See generally Pride v. Southern Bell Telephone and Telegraph Co., 244 S.C. 615, 138 S.E.2d 155, 157 (1964). Nonetheless, they are not per se unenforceable, and, aside from the law's disfavor, Georgetown offers no convincing reason why the limitation of liability ought not be enforced here.[3]
 
 
 19
 Exculpatory clauses are most abusive (and most disfavored) when they are included without fanfare in nonnegotiable"contracts" imposed upon consumers. Georgetown was certainly not in such a hapless position; it had at least as much bargaining power as Law. See South Carolina Electric & Gas Co. v. Combustion Engineering, Inc., 283 S.C. 182, 322 S.E.2d 453, 457 (App. 1984) (upholding disclaimer of warranties in contract between "commercially sophisticated businesses"). The method by which the "General Conditions" were incorporated into the contract confirms that Georgetown was made aware of them; moreover, the "General Conditions" are not a abstruse tome, but rather a single page, plainly written and easily read. Finally, the clause is hardly oppressive, inasmuch as it offers tolerable terms under which Law would waive the limit of liability. All of these considerations lead us to conclude that Georgetown simply accepted the clause with its eyes open. Thus, we affirm that portion of the district court's judgment limiting Georgetown's recovery to $50,000.
 
 III.
 
 20
 The district court held that Law owed no duty of due care to Carbide. Therefore, even though Law was negligent in approving the slag as fill without investigating its potential expansiveness, it was not liable for the damage caused to Carbide from this negligence.
 
 
 21
 Law does not attempt to defend the district court's reasoning. Tort liability, derived from duties imposed by the law, is not dependent on the existence of a contract between plaintiff and defendant. Edward's of Byrnes Downs v. Charleston Sheet Metal Co., 253 S.C. 537, 172 S.E.2d 120, 122 (1970). On the other hand, the law imposes its duties as the situation and the relationship of the parties demand. For example, there are doubtless many soil engineering firms in this country, and the law does not obligate them to act as heroes-at-large, vigilantly seeking out and warning companies who might be tempted to build on steel slag. See Jensen v. Anderson County Dep't of Social Services, 304 S.C. 195, 403 S.E.2d 615, 617 (1991) ("Generally, there is no common law duty to act."). However, a party that undertakes to perform a contract assumes a duty of due care to foreseeably affected third parties. Id.; Barker v. Sauls, 289 S.C. 121, 345 S.E.2d 244 (1986); Terlinde v. Neely, 275 S.C. 395, 271 S.E.2d 768, 770 (1980). Law assumed a duty of due care to Carbide by contracting with Georgetown to provide soil engineering services. See Restatement (Second) of Torts § 324A.[4] If it performed these services negligently,
 
 
 22
 Law knew that it could seriously harm whoever owned any interest in the plant. Hence, it had a duty of "commensurate care." Mickle v. Blackmon, 252 S.C. 202, 166 S.E.2d 173, 185 (1969).
 
 
 23
 The key inquiry is foreseeability, not privity. In our mobile society, it is clearly foreseeable that more than the original purchaser will seek to enjoy the fruits of the builder's efforts. The plaintiffs, being a member of the class for which the home was constructed, are entitled to a duty of care commensurate with industry standards.
 
 
 24
 Terlinde, 271 S.E.2d at 770.[5] Carbide was within the "class" of persons for whom Law performed its services, and Law consequently owed it a duty of due care.
 
 
 25
 Nonetheless, Law argues that we can affirm the district court's judgment because the record shows that Carbide did not rely on Law's opinion as to the suitability of slag. This argument is simply a thinly veiled resurrection of Law's prior position that it had no duty to test the slag or otherwise inquire into its suitability as fill. In the first appeal in this case, we rejected this contention and held that Law had been negligent in approving the use of slag. Moreover, no reasonable trier of fact could find that Carbide did not rely on Law's approval of slag fill. Carbide insisted on site investigation and preparation by a competent engineering firm, and it built the plant on slag only after receiving Law's approval. There is no evidence from which any trier of fact could find that Carbide would have built the plant on slag had Law disapproved of its use as fill. Reliance is as manifest as it could be.
 
 
 26
 We must reverse the judgment for Law on Carbide's negligence claim.
 
 IV.
 
 27
 South Carolina is "in the vanguard in permitting a plaintiff to recover economic loss from a seller with whom he did not deal and who made no express warranties to him." JKT Co. v. Hardwick, 274 S.C. 413, 265 S.E.2d 510, 512 (1980). Unlike many jurisdictions, South Carolina imposes an implied warranty of suitability for a particular purpose on suppliers of services as well as manufacturers of goods. Hill v. Polar Pantries, 219 S.C. 263, 64 S.E.2d 885, 888 (1951). Moreover, the South Carolina Supreme Court"ha[s] been steadfast in holding that privity of contract as a defense to an implied warranty action is abolished in this State," Kennedy v. Columbia Lumber & Manufacturing Co., 299 S.C. 335, 384 S.E.2d 730, 736 (1989) (citing cases), and, over a decade ago, the court attempted "to still all whispers of its continued vitality." JKT, 265 S.E.2d at 513.
 
 
 28
 In holding that Law had not breached an implied warranty to Carbide, the district court stated that it was "hesitant" to discard the concept of privity because this case involved "commercial sophisticates." However defensible this hesitation might be in a purely academic debate, we as federal courts are bound to apply state law as we find it, and the South Carolina Supreme Court will not hear even a "whisper" of the defense of lack of privity in an implied warranty action.
 
 
 29
 We must therefore reverse the judgment on Carbide's implied warranty claim.[6]
 
 V.
 
 30
 Finally, Law requests that we remand Carbide's negligence claim for findings on Law's defense of contributory negligence. Law neither describes the factual theory in support of this alleged defense nor identifies any evidence in the record to sustain it. Law concedes (indeed it emphasizes) that Georgetown's Rishel was the only actor on the spot who had any personal knowledge of slag's expansiveness. In the first appeal, notwithstanding Rishel's knowledge, we rejected Law's contributory negligence defense against Georgetown. Barring Carbide's claim would be incongruous with our prior ruling as to Georgetown, and, as we said, Law offers no factual distinction that would warrant a difference here.
 
 
 31
 The judgments in favor of Law on Carbide's claims for negligence and breach of implied warranty are reversed, and the case is remanded with instructions to calculate damages and enter judgment for Carbide.
 
 REVERSED AND REMANDED
 
 
 [1]
 The prime culprits in the expansion were calcium oxide and magnesium oxide, which hydrate into calcium hydroxide and magnesium hydroxide. When all of the oxides have hydrated, the swelling of the slag stops. The process is relatively rapid for the calcium oxide, but may take many years for the magnesium oxide. There was also a great deal of ferric oxide-ordinary rusted iron-in the Georgetown slag; its presence created the potential for further long-term swelling
 
 
 [2]
 Georgetown's claims against Pittsburgh Testing included damages for slag expansion under other facilities on the mill site. These claims have been resolved and are not at issue in this appeal
 
 
 [3]
 The reasons advanced by Georgetown are that the provision was effectively "hidden," the heading "WARRANTY AND LIMITATION OF LIABILITY" was so confusing that it would not have known the paragraph might limit negligence liability, and the practice of engineering is so infected with the public interest that exculpatory clauses for engineers should be wholly prohibited. The first two arguments are simply hard to believe in light of Georgetown's sophistication; the third would be a new point of South Carolina law, and we see no indication that the South Carolina Supreme Court would adopt a per se rule against limits of liability for engineers
 
 
 [4]
 Section 324A provides:
 One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
 (a) his failure to exercise reasonable care increases the risk of such harm, or
 (b) he has undertaken to perform a duty owed by the other to the third person, or
 (c) the harm is suffered because of reliance of the other or the third person upon the undertaking. Whether it fits (a) or (c), and it may, the Law-Georgetown-Carbide relationship is pellucidly described in (b). Carbide insisted that Georgetown obtain competent soil engineering services, Georgetown hired Law to discharge its obligation to Carbide, and Law plainly "recognized" that it was rendering these services for Carbide's protection.
 
 
 [5]
 South Carolina has even recognized a duty of due care to a party intended to be disadvantaged, rather than benefitted, by a commercial contract. In South Carolina State Ports Authority v. Booz-Allen & Hamilton, Inc., 289 S.C. 373, 346 S.E.2d 324 (1986), the port of Savannah had hired an advertising firm to prepare materials extolling the merits of Savannah over the port of Charleston. The materials that the firm prepared contained statements of fact that were false and would have been discovered to be false on reasonable investigation. When the port of Charleston began to lose business, the state port authority sued the advertiser for damaging the port by making negligent misrepresentations of fact. The South Carolina court held that the advertising firm had a duty in tort to the port of Charleston when it undertook to "objectively analyze and compare the attributes of commercial competitors for the purpose of giving one a market advantage over the other." 346 S.E.2d at 326
 
 
 [6]
 Carbide offers no argument concerning the district court's denial of its claim for breach of express warranty, so we consider that claim abandoned