**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ALPINE FORREST PARTNERS, A
California Limited Partnership,
<u>Plaintiff-Appellant,</u>

v.

No. 95-1871

CROWN CENTRAL PETROLEUM
CORPORATION; ATEC ENVIRONMENTAL
CONSULTANTS, a Division of ATEC
Associates, Incorporated,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Matthew J. Perry, Jr., Senior District Judge.
(CA-90-2730-3-0, CA-91-2526-3-0)

Argued: April 4, 1996

Decided: February 6, 1998

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion. Judge Hall wrote an
opinion dissenting in part.

_____

**COUNSEL**

**ARGUED:** Deborah R.J. Shupe, BERRY, ADAMS, QUACKEN-
BUSH & DUNBAR, P.A., Columbia, South Carolina, for Appellant.
James Lynn Werner, OGLETREE, DEAKINS, NASH, SMOAK &

STEWART, L.L.P., Columbia, South Carolina, for Appellee Crown Central; Charles E. Carpenter, Jr., RICHARDSON, PLOWDEN, GRIER & HOWSER, P.A., Columbia, South Carolina, for Appellee ATEC. **ON BRIEF:** Theodore von Keller, BERRY, ADAMS, QUACKENBUSH & DUNBAR, P.A., Columbia, South Carolina, for Appellant. Cheryl L. Behymer, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, L.L.P., Columbia, South Carolina, for Appellee Crown Central; Francis M. Mack, RICHARDSON, PLOW-DEN, GRIER & HOWSER, P.A., Columbia, South Carolina, for Appellee ATEC.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Alpine Forrest Partners, a limited partnership, appeals from a judgment entered on a jury verdict in favor of defendants Crown Central Petroleum Corporation and ATEC Associates, Inc., in Alpine Forrest's suit alleging property damage from a trespassing (and leaking) underground gasoline storage tank. We affirm the judgment of the district court.

I.

In 1987, Crown Central Petroleum purchased a convenience store on Alpine Road in Columbia, South Carolina, which it operated under the name "Fast Fare." The Fast Fare store sold gasoline. Next door was the Alpine Forrest Mobile Home Park.

In the late eighties, there was a flurry of regulatory interest in the old and often shoddy underground storage tanks used by gasoline stations. In June, 1989, Crown Central hired defendant ATEC Associates, Inc., to install monitoring wells at the Alpine Road Fast Fare.

2

ATEC discovered a leak on August 28, 1989, and the leak was promptly reported to state authorities. A faulty pipe was found and quickly repaired. A small amount of gasoline has migrated under the driveway leading into Alpine Forrest, though it has caused no harm aside from its presence.[1]

In October 1989, Urban Assets, Inc., a company that buys and operates mobile home parks, approached the owners of Alpine Forrest about a potential sale. Lou Frasco was Urban Assets' founder and prime mover. Frasco hired ATEC, through its ATEC Environmental Consultants division, to prepare a "Phase I environmental survey" of the property. ATEC agreed to do the survey for a $2,500 fee. As its proposal states, "Particular emphasis will be placed on any above-ground drums or tanks, the possibility of underground storage tanks (USTs), stained areas, past dumping or disposal of debris, any areas showing evidence of vegetative stress, on-site transformers, and a cursory inspection for potential asbestos containing building materials (ACBMs)."

Frasco testified that he told Davies Batterton of ATEC that the purchaser of the property would be a limited partnership of investors to be organized by Urban Assets. Batterton did not recall this alleged comment, though he admitted that such arrangements are common in the business, that ATEC often performs work for one party knowing that a different legal entity will actually purchase the subject property, and that ATEC is aware that the ultimate purchaser will rely on its assessment.

On December 8, 1989, ATEC provided the survey to Urban Assets. It reported no problems on or near the property, except for a leaking electrical transformer, which was replaced. Full payment was then tendered to ATEC by plaintiff Alpine Forrest Partners, a limited partnership newly formed by Urban Assets to hold title to the mobile home park.[2] ATEC accepted the payment.

_____

[1] The tanks were removed in December, 1991.
[2] Frasco explained that Urban Assets serves simply as a real estate agent for various groups of investors, and he always forms a limited partnership of those investors to be the legal owner of a property. Urban Assets had previously paid half of ATEC's fee, so Alpine Forrest's tender of the full $2,500 resulted in an overpayment to ATEC.

3

On January 12, 1990, Alpine Forrest Partners purchased the property for $1,400,000, and it has operated the park at full or nearly full capacity.[3] It has been able to raise rents. The market value of the property, though, is quite a bit less than Alpine Forrest paid. The source of this deficit is the main issue here.

Just a few days after his purchase, Frasco inspected the property. He noticed a fence that he believed encroached on his property, as well as Crown Central's monitoring wells. The surveyor employed for closing had not reported any encroachments.[4] A new survey showed that Frasco was right; Crown Central's tanks, fence, and some contaminated ground were on Alpine Forrest's side of the line.

Frasco immediately approached Crown Central with a proposal to deed the parcel on which the tanks encroached to Crown Central if it would purchase and convey to him an adjoining $45,000 parcel on which he already held an option. Crown Central rejected the offer. In a phone call and letter, its general counsel asserted that Crown Central owned the land on which the encroachments stood by adverse possession. In the letter, counsel stated:

> The tanks have been located on the property for well over the [statutory period]. Second, the area in question has been enclosed by a chain link fence. Third, the area is maintained by Fast Fare, Inc.: the grass is cut periodically and concrete pads have been constructed in the area surrounding the tank fills. These pads and fill caps are clearly visible.

On October 8, 1990, Alpine Forrest filed separate suits in state court against Crown Central and ATEC. The suit against Crown Central alleged claims of nuisance and trespass. ATEC was charged with professional negligence and breach of contract. The suits were removed to district court. After a long period of discovery, the cases were consolidated for trial. A jury trial was held from April 4-8, 1994. At the close of the evidence, Alpine Forrest was permitted to amend

_____

[3] We were informed at argument that the property has recently been sold.

[4] The surveyor has been sued in a separate case.

4

its pleadings to assert a negligence claim against Crown Central, and Alpine Forrest voluntarily dismissed its claim for professional negligence against ATEC.

The jury returned a defense verdict on all counts. Alpine Forrest's motion for judgment notwithstanding the verdict or for a new trial was denied. Alpine Forrest appeals.

II.

The suits against Crown Central and ATEC were filed separately. Much of the discovery overlapped, though, as did the underlying nucleus of fact and many of the witnesses. Shortly before the trial, the district court granted ATEC's motion to consolidate the cases for trial. Alpine Forrest opposed consolidation and now asserts error. The district courts have broad discretion to consolidate related actions pending in their districts, A/S J. Ludwig Mowinckles Rederi v. Tidewater Construction Corp., 559 F.2d 928, 933 (4th Cir. 1977), and we review only for abuse of that discretion.

Though Alpine Forrest alleges repeatedly in its brief that it was "unduly prejudiced" by the consolidation, and that there was a "very real possibility and likelihood of jury confusion," it has not explained to our satisfaction when or how these ill effects occurred. We see no abuse of discretion.

III.

We now turn to Alpine Forrest's attacks on the judgment for Crown Central. We must affirm the denial of judgment n.o.v. if there is substantial evidence to support the verdict. White v. County of Newberry, 985 F.2d 168, 172-173 (4th Cir. 1993). The district court may grant a new trial if the verdict is clearly against the weight of the evidence, and we review its decision for abuse of discretion. Bristol Steel & Iron Works, Inc. v. Bethlehem Steel Corp. , 41 F.3d 182, 186 (4th Cir. 1994).

In South Carolina, violation of a statute is negligence. This "doctrine" has its own name -- "negligence per se" -- and the name is

5

unfortunately misleading, inasmuch as it suggests something akin to strict liability. Instead, all the statute does is to define the applicable duty of care.

South Carolina has a statute that prohibits the direct or indirect discharge of pollutants into the environment without a permit.[5] S.C. Code Ann. § 48-1-90. Alpine Forrest would take the indisputable fact that there was a gas leak and convert it into liability. There are several problems with this theory.

First, there was evidence from which the jury could find that the discharge had completely ended before Alpine Forrest bought the property.[6] The right to sue on account of a completed tort is not conveyed sub silentio in a deed of realty. It is a chose in action, which is a personal right that must be specifically assigned. See generally 63A Am.Jur.2d Property §§ 25-26; Restatement (Second) of Torts § 162.

Moreover, because Alpine Forrest asserts damages measured by permanent diminution in the land's value, it must show permanent damage. Gray v. Southern Facilities, Inc., 256 S.C. 558, 183 S.E.2d

_____

[5] In relevant part, the statute reads:

> (a) It shall be unlawful for any person, directly or indirectly, to throw, drain, run, allow to seep or otherwise discharge into the environment of the State organic or inorganic matter, including sewage, industrial wastes and other wastes, except as in compliance with a permit issued by the Department.

It if were read literally, the statute would be nonsensical, inasmuch as all matter is either "organic or inorganic." However, the examples given show that "matter" is limited to substances with a potential to cause environmental harm. Noscitur a sociis. See also S.C. Code Ann. § 48-1-10, defining, among others, "sewage," "industrial waste," "other wastes," and "pollution," but not "matter").

[6] Only the discharge violates the cited statute. The resulting condition of pollution does not. Carolina Chemicals, Inc. v. South Carolina Dep't of Health and Environmental Control, 290 S.C. 498, 351 S.E.2d 575, 577 (App. 1986). Alpine Forrest did present circumstantial evidence from which the jury could have found that the tank leaked after 1989, but the jury could rationally have rejected it.

438, 443 (1971). Gasoline is made of hydrocarbons-- the building blocks of life -- and it is consequently biodegradable. Crown Central presented expert testimony that the plume of gasoline has already ceased to spread, because bacterial degeneration has begun to occur at the fringes. Crown Central has given Alpine Forrest an unconditional promise of indemnity should any additional measures be needed. There was no evidence presented of diminished rental value, of other current expenses to Alpine Forrest, or of a permanent diminution that would outlast remediation of the leak. [7]

Next, the jury could have found that the "diminution" was no diminution at all. Alpine Forrest paid $1.4 million for property assessed for taxes at $785,400. The park may never have been worth more than the $900,000 "after leak" value claimed by Alpine Forrest at trial.

Finally, "negligence per se" ordinarily requires a <u>knowing</u> violation of the statute from which the duty of care is imputed. <u>E.g., Niver v. So. Carolina Dep't of Highways</u>, 302 S.C. 461, 395 S.E.2d 728 (App. 1990) (plaintiff was not contributorily negligent for violating a statute prohibiting passing near intersections, because the plaintiff did not know he was approaching an intersection). The jury could certainly have found that Crown Central did not knowingly discharge the gasoline.

IV.

Alpine Forrest's trespass claim is stronger, but we find no reversible error.

In South Carolina, trespass is an intentional tort. <u>Snow v. City of Columbia</u>, 409 S.E.2d 797, 802 (S.C. App. 1991).

> Although neither deliberation, purpose, motive, nor malice are necessary elements of intent, the defendant must intend

---

[7] Alpine Forrest was required to discontinue use of a water well and hook up to city water, at considerable expense, but not on account of the spilled gasoline; instead, new state water quality monitoring regulations had recently gone into effect, rendering continued use of the well prohibitively expensive.

the act which in law constitutes the invasion of the plaintiff's right. Trespass is an intentional tort; and while the trespasser, to be liable, need not intend or expect the damaging consequence of his entry, he must intend the act which constitutes the unwarranted entry on another's land.

Id. To prove Crown Central's intent, Alpine Forrest attempted to introduce an oral statement and, on rebuttal, a letter from Crown Central's counsel asserting that the company owned the parcel by adverse possession and making allegations of particular facts in support of that contention. The district court excluded this evidence, as well as any mention that Crown Central had initially asserted an adverse possession defense in its answer.

At least as regards the statement of and letter from Crown Central's general counsel, we are troubled by this ruling."Adverse" possession is open occupation of the land, hostile to the true owner's rights. Intent to do the act that invades the true owner's rights is surely subsumed in the concept of hostility. Crown Central's assertions therefore admit intent to trespass.

It is true, as Crown Central notes, that alternative pleadings cannot be used as admissions, and neither, generally, can bare legal conclusions. However, the letter by the general counsel was not a pleading; it was written long before litigation commenced. Moreover, though "adverse possession" is itself a "legal" term, in the context of the letter it encompasses the assertions of fact (primarily"hostility") that are its elements. Indeed, the letter contains statements of pure fact (e.g., Crown Central fenced the area and mows it) that go to Crown Central's intent. Exclusion of these statements was likely error.

Any error, however, was rendered harmless by Alpine Forrest's failure to prove actual damage resulting from the trespass of the tanks. As we have noted, Alpine Forrest has measured its damage by the permanent diminution of the value of its property. The tanks are gone, and were gone long before the trial. Their mere memory does not have a legally cognizable effect on the value of a mobile home park.

8

Cf. Gray, 183 S.E.2d at 443-444 (rejecting as "speculative" evidence that a completed tort had injured the "reputation" of the land).**8**

V.

We next turn to Alpine Forrest's claim against ATEC for breach of contract. In a special interrogatory, the jury found that Alpine Forrest was not an intended direct beneficiary of the contract between ATEC and Urban Assets. The special interrogatory read:

> Do you find that the contracting parties, Urban Assets, Inc., and ATEC Environmental Consultants, intended to create a direct, rather than an incidental or consequential, benefit to the plaintiff, Alpine Forrest Partners?

The jury answered "No" to this interrogatory. **9** Alpine Forrest had

_____

**8** It is, of course, among the most ancient of common law doctrines that damage is presumed from a trespass to land. Snow, 409 S.E.2d at 802 (citing Lee v. Stewart, 10 S.E.2d 804 (N.C. 1940)). If the presence of the tanks were a trespass, Alpine Forrest was entitled to an award of nominal damages notwithstanding its failure to prove actual damages. If we were a state court, we could enforce this hoary formality by granting a new trial nisi additur awarding Alpine Forrest one dollar, which Crown Central would doubtless accept. However, the Seventh Amendment precludes us from conditioning a new trial on the defendant's unilateral acceptance of an additur. Dimick v. Schiedt, 293 U.S. 474 (1935). In these circumstances, we must simply affirm or reverse. The question before us, then, is whether an error that, at most, deprived Alpine Forrest of nominal damages is an error that affects its substantial rights. Fed. R. Civ. P. 61. It surely is not.

Alpine Forrest's other potential trespass claim involves the continued presence of the gasoline, even though the initial discharge is not actionable because of its accidental nature. See Ravan v. Greenville County, 434 S.E.2d 296, 306-307 (S.C. App. 1993). Again, though, the jury could rationally have found that the mobile home park suffered no permanent diminution in value because of the nonpermanence of gasoline, Crown Central's unequivocal guarantee to bear the costs of any remediation, or both.

**9** The form of the special verdict mentioned above was agreed to by Alpine Forrest. The case was also submitted to the jury by way of

9

agreed to the interrogatory which obviously was taken verbatim from the law as stated by the South Carolina Supreme Court:

> For the [third party beneficiary] rule to apply to a contract not required by public law or regulation, it must appear that the result of it was intended by the contracting parties, <u>that is that they intended</u> (contrary to the presumption) <u>to create a direct, not incidental or consequential, benefit to the third party</u>, a stranger to the contract.

<u>Cothran v. Rock Hill</u>, 43 S.E.2d 615, 616-617 (S.C. 1947) (emphasis added). That very language has since been followed at least twice in South Carolina in <u>Touchberry v. City of Florence</u>, 367 S.E.2d 149, 150 (S.C. 1988), and <u>Bob Hammond Construction Co., Inc. v. Banks Construction Co.</u>, 440 S.E.2d 890, 891 (S.C. App. 1994).

The evidence presented at trial was sufficient for the jury to find that there was no intention by ATEC to benefit directly anyone other than Urban Assets and that any benefit to a third party was incidental or consequential. Frasco contacted ATEC on behalf of Urban Assets. The proposed contract from ATEC was addressed directly to Frasco and Urban Assets without reference to Alpine Forrest or any other party. Urban Assets responded to the proposed contract stating that it enclosed a check for $2,500 for services without reference to any other party, and ATEC's report was made directly to Frasco at Urban Assets. While Frasco testified that he advised Batterton of ATEC that he was acting in the name of a limited partnership, that testimony was

_____

another agreed to form of special verdict, as well as a general verdict, both of which were returned in favor of ATEC as follows:

> We the jury unanimously find for the plaintiff as to the following cause of action: Breach of contract?
>
> A: No.
>
> We the jury unanimously find for the defendant, this Eighth Day of April, 1994.
>
> /s/ Leslie Johnson
>
> Foreperson
>
> Columbia, South Carolina

10

refuted by Batterton who testified that there was no mention of a limited partnership during his initial conversation with Frasco or at any time prior to Urban Assets' acceptance of ATEC's proposal. There was no reference to any other parties than Urban Assets in the proposal or acceptance letters. ATEC's final report was dated December 8, 1989 and was directed to and received by Urban Assets and Frasco in December. Frasco testified that there was, in fact, no limited partnership established at the time of his contracting with ATEC and that Alpine Forrest Partners, the plaintiff limited partnership, was not established until January 9, 1990, just prior to closing on the purchase of the property.

The jury's verdict that ATEC and Urban Assets did not intend to create a direct, rather than an incidental or consequential, benefit to the yet unformed limited partnership, which is now the plaintiff, is quite supported by the evidence. Thus the district court did not abuse its discretion in denying ATEC's motion to set aside the verdict.

The judgment of the district court is accordingly

AFFIRMED.

HALL, Circuit Judge, dissenting in part:

I concur in Parts I through IV of the majority opinion, but I cannot agree with Part V. The verdict for ATEC is clearly against the weight of the evidence, and I would grant Alpine Forrest a new trial on its contract claim.

ATEC contracted to survey the property with "particular emphasis" on underground storage tanks. By doing so, it implicitly warranted the suitability of its services for the purpose at hand, i.e. helping the prospective purchaser to evaluate the property. Hill v. Polar Pantries, 219 S.C. 263, 64 S.E.2d 885, 888 (1951). Though it had corporate knowledge of the leak at the Fast Fare, and the monitoring wells invited careful investigation, ATEC failed to discover the encroachments or contamination. A reasonable jury could find that ATEC fell short of its contractual obligations.

11

ATEC performed the work at the instance of Frasco, whom it knew was considering the purchase of the property. There is not any indication that the specific legal identity of the ultimate purchaser had anything to do with ATEC's contractual duties. It contracted with a Frasco-organized corporation (Urban Assets) and accepted payment from a Frasco-organized partnership (Alpine Forrest). Alpine Forrest was not just an intended beneficiary of the contract; it was the only one. Cf. Kennedy v. Columbia Lumber & Manufacturing Co., 299 S.C. 335, 384 S.E.2d 730, 736 (1989) (strict privity of contract unnecessary in action to enforce an implied warranty); JKT Co. v. Hardwick, 274 S.C. 413, 265 S.E.2d 510, 512 (Ct.App. 1980) (South Carolina is "in the vanguard in permitting a plaintiff to recover economic loss from a seller with whom he did not deal and who made no express warranties to him") (overruled in part on other grounds, Town of Winnsboro v. Wiedeman-Singleton, Inc., 303 S.C. 52, 398 S.E.2d 500 (Ct.App. 1990), aff'd, 307 S.C. 128, 414 S.E.2d 118 (1992)).[1] Because the jury's finding is so clearly against the weight of the evidence, I believe that the district court abused its discretion in denying a new trial.[2]

_____

[1] I suspect that the law of third-party beneficiaries is not the best fitted to Alpine Forrest's case. Urban Assets' rights in the sales transaction and ATEC contract were surely, even if informally, transferred to Alpine Forrest. ATEC received notice of this transfer when it received Alpine Forrest's check, to which it consented through acceptance. An assignment of contractual rights can establish the privity required for a first-party claim. Professional Bankers Corp. v. Floyd , 285 S.C. 607, 331 S.E.2d 362, 364-365 (Ct.App. 1985).

[2] ATEC also argues that the general verdict cures any possible error on the third-party beneficiary issue. I disagree. Where a general verdict may rest on an erroneous ground, and there is no way to discern otherwise, the verdict must be set aside. Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 370 U.S. 19, 29-30 (1962). Here, there is positive evidence -- the special interrogatory -- that the jury rested its general verdict on the third-party beneficiary issue, so the Sunkist rule applies with full force.

12