16496

HILL v. POLAR PANTRIES

(64 S. E. (2d) 885)

*Messrs. W. D. Workman* and *J. D. Todd, Jr.,* of Green-
ville, *for Appellant,*

Messrs. *Price & Poag,* of Greenville, and *Watkins & Watkins,* of Anderson, *for Respondent,*

April 30, 1951.

OXNER, Justice.

This is an action for the recovery of damages alleged to have been caused by the negligence of appellant in furnishing unsuitable and defective plans and specifications for the insulation of a frozen food locker plant and in failing to properly supervise the work. The trial resulted in a verdict for respondent in the sum of $10,100.00. The only question for determination on this appeal is whether the Court below erred in refusing a motion by appellant for a directed verdict. Appellant contends that there is no proof of a breach of the contract made with respondent and no evidence showing the cause of the damage complained of.

Appellant, a South Carolina corporation, has operated a frozen food locker plant at Greenville, South Carolina, since 1940. During July, 1945, respondent became interested in constructing a similar plant at Belton, South Carolina. He

had never had any experience in this business and, in fact, had never been in a frozen food locker plant. Shortly thereafter he met and discussed the matter with Mr. C. M. Snelling, Jr., President of the appellant corporation. On October 29, 1945, these parties entered into a contract wherein appellant, in consideration of the payment by respondent of a commission of 22½% of the cost of the equipment and insulation, agreed (1) to furnish the design of the layout of a frozen food locker plant to be constructed by respondent at Belton, S. C., together with blueprints of such design, (2) to fully advise respondent and offer suggestions deemed desirable as to the structure and the materials necessary to adequately serve the needs of the plant, (3) to furnish and install in accordance with good practice necessary controls and equipment, including insulation required for successful operation, (4) to purchase all equipment at the best possible price and to allow respondent the benefit of all discounts, and (5) if desired, to instruct in its Greenville plant any employees of respondent so as to familiarize such employees with the operation of a frozen food locker plant. The costs of the building, insulation and equipment were to be paid by respondent. There are other stipulations contained in this contract but they need not be reviewed since they are not germane to the controversy.

It is clear from an examination of the entire contract that the commissions to be paid appellant were primarily intended to compensate it for furnishing the skill and knowledge necessary for the proper construction and equipment of a frozen food locker plant. Appellant held itself out as specially qualified to perform work of this nature as shown by the following recitals in the contract:

"Whereas, Polar Pantries of Greenville, South Carolina, having designed, equipped and operated its own frozen-food locker plant since 1940 and also by reason of being dealer-distributor for Frigidaire locker plant equipment, is prepared to design, equip and operate locker plants in this vicinity and to instruct in the detailed operations of this business, and

"Whereas, the undersigned, Fred Hill, proposes to establish a locker plant at Belton, South Carolina, and desires to obtain the benefit and use of the experience acquired by Polar Pantries both in the design and operation of such plant  *  *  *."

Plans and specifications, calling for a building approximately 58 by 63 feet, including a locker room with space for 636 lockers, were duly prepared in accordance with appellant's design. On December 6, 1945, a contract for the construction of the building was awarded to Morris Construction Company of Greenville. The building, including the insulation, was completed about April, 1946. The equipment was installed in September. The total cost of the plant amounted to approximately $35,000.00. About October 1, 1946, the cooling process in the locker room was turned on. The temperature was first fixed above freezing and gradually reduced until it reached about zero. Three or four weeks later pin cracks appeared in the floor. At first not a great deal of significance was attached to these small cracks but they graudally grew larger and in about a year reached a point where they were approximately three inches in width. There was a bulge in the floor in some places as much as seven inches. Finally, the walls cracked. During the fall of 1948 it had become impossible to use the locker room and the lockers were then removed to a new room which respondent had constructed. Respondent made a claim against appellant for damages but appellant denied liability. Thereafter in April, 1949, this action was commenced.

It is alleged in the complaint that appellant breached the contract (1) by furnishing faulty, defective and unsuitable plans and specifications for the insulation of said plant and (2) by improperly supervising the work of insulation. Appellant interposed a general denial, alleged that respondent had failed to follow its drawings, blueprints and specifications, asserted that its authorty was limited to giving advice and making suggestions which were frequently disregarded, and further alleged contributory negligence on the part of

respondent in failing to comply with its written and oral specifications.

This controversy hinges largely upon the construction of the floor of the locker room. Although the actual construction was done by the Morris Construction Company, the plans and specifications were prepared by Mr. Snelling, who also directed and supervised the work. The following type of insulation was used in this floor: The ground was graded and four inches of stone placed on a clay bottom. The stone was then covered with what is termed "vapor seal", consisting of tarred felt and asphalt, which was designed to keep out moisture from the ground. On top of this vapor seal there was placed fifteen inches of a mixture of concrete and vermiculite, a lightweight insulating material. About fourteen or fifteen gallons of water were used to each cubic foot of cement. This mixture dries very slowly. Electric heaters and coke burners were used in the drying process. Several weeks after the vermiculite mixture had been laid, Mr. Snelling and a representative of the vermiculite manufacturer made a test by drilling some holes and concluded that it was sufficiently dry to proceed with the construction. The vermiculite was then covered with two and a half inches of concrete.

It is appellant's contention that there is no evidence reasonably warranting the inference that any negligence on its part caused the damage sustained by respondent. It is said in appellant's brief: "The plaintiff's loss could be due to the neglect on the part of the defendant. It could just as well be due to negligence on the part of Morris Construction Company, who built the building and who installed the insulation in the floor. It could be due to negligence on the part of plaintiff in operating the plant. It could just as well have been the result of an unforeseeable accident. The evidence, direct and circumstantial, does not indicate which."

Both respondent and Mr. Morris of the Morris Construction Company testified that the damage was caused by ice forming in the floor. Mr. Morris further testified:

"Q. You got any idea what caused ice to get in there? A. There is a possibility all the moisture had not gotten out of the vermiculite concrete." Another witness, an architect, testified that the damage probably resulted from the choice of insulation material. Appellant's President, Mr. Snelling, testified that respondent failed to follow his plans and specifications and changed them without his approval. The following is taken from Mr. Snelling's testimony:

"Q. If your plans and specifications had been followed, in your opinion, would Mr. Hill have suffered any damage? A. No, sir.

\* \* \*

"Q. I don't want to take advantage of you. You say there is no doubt yourself that something went bad with that floor? A. Mr. Price, there are a lot of different things that could happen; the ground could slough away from under it, for instance."

In determining whether there was sufficient evidence to warrant submission of the case to the jury, it must be kept in mind that the fact that an injury may have occurred in one of several ways does not defeat a plaintiff's right of recovery if the evidence tends to sustain the reasonable probability of the one relied on. In a civil case the law does not require proof to a certainty. *Moseley v. Southern Railway Co.*, 164 S. C. 193, 162 S. E. 94, 95; *Worrell v. S. C. Power Co.*, 186 S. C. 306, 195 S. E. 638; *Rivers v. State Highway Department*, 186 S. C. 493, 196 S. E. 172.

We think appellant's motion for a directed verdict was properly refused. It may be reasonably inferred from the testimony that respondent's damage was caused either by defective insulation plans and specifications or by improper supervision of the work, or both. The evidence tends to negative any other cause. The elevation and construction of the floor was such as to reasonably exclude any probability of water or moisture coming from the ground. There is no evidence that the plant was improperly

operated. In fact, Mr. Snelling admitted, in effect, that the damage was not caused by any lack of skill or experience on the part of respondent's employees. Mr. Snelling testified that if his plans and specifications had been followed, the damage would not have occurred. In other words, it seems to be his view that the damage resulted from the plans and specifications which were actually used in insulating the locker room. Who was responsible for these plans and specifications? Mr. Snelling says that those prepared by him were not followed and that numerous changes were made without his approval. It seems to be undisputed that there were changes or modifications but according to the testimony offered by respondent, these were made by Mr. Snelling and the floor of the locker room was constructed strictly in accordance with his directions. No one except Mr. Snelling appears to have had any previous experience in constructing or operating a frozen food locker plant. Both respondent and Mr. Morris of the Morris Construction Company testified that they depended entirely upon his skill and knowledge. It was a question for the jury to determine, in view of the conflict in the testimony, whether Mr. Snelling authorized and approved the plans and specifications which were actually used and whether he properly supervised the work.

It further appears from the testimony that although Mr. Snelling held himself out as possessing the requisite skill to design a frozen food locker plant and to supervise its construction, his only knowledge and experience came from the operation of the appellant plant at Greenville. It may be added that appellant received a commission on this job of approximately $3,500.00

Finally, it is argued that appellant did not contract to supervise the job. It is true that there is no express stipulation to this effect but we think this obligation may be fairly implied. This was the interpretation which the parties themselves placed upon the contract. Appellant's counsel brought out on cross examination of respondent that

Mr. Snelling was to "furnish the blueprints and supervise" the work. Mr. Snelling, himself, testified as follows:

"Q. In spite of the changes, did you continue to supervise the work as best you could? A. As best I could because my contract did state that I should make my experience available to him and I did the best I could to him on that."

It seems to be well settled that where "a person holds ▉▉ himself out as specially qualified to perform work of a particular character, there is an implied warranty that the work which he undertakes shall be of proper workmanship and reasonable fitness for its intended use, and, if a party furnishes specifications and plans for a contractor to follow in a construction job, he thereby impliedly warrants their sufficiency for the purpose in view." 17 C. J. S., contracts, § 329, page 781. These principles have been applied to building contracts. *Minemount Realty Co., Inc. v. Ballentine*, 111 N. J. Eq. 398, 162 A. 594; *General Fireproofing Co. v. L. Wallace & Son*, 8 Cir., 175 F. 650; *Kennedy v. Bowling*, 319 Mo. 401, 4 S. W. (2d) 438. Also, see *Avent v. Proffitt*, 109 S. C. 48, 95 S. E. 134, where an architect was held liable for failure to discover and condemn defective plastering in a house erected under his supervision.

We think there is ample evidence tending to show a breach by appellant of the foregoing implied obligation. Of course, there was testimony to the contrary but the jury was the proper tribunal to pass on these disputed facts.

All exceptions are overruled and the judgment below affirmed.

FISHBURNE, STUKES and TAYLOR, JJ. and E. H. HENDERSON, A. A. J., concur.