22824

John Lamar KENNEDY, Appellant v. COLUMBIA LUMBER AND MANUFACTURING COMPANY, INC., Respondent.

(384 S. E. (2d) 730)

Supreme Court

*Thomas J. Hummel, Robert J. Thomas* and *A. L. Blackstone, III,* Columbia, *for appellant.*

*William C. Boyd, III* and *Phyllis B. Burkhard,* Columbia, *for respondent.*

Reheard May 3, 1988.

Decided Sept. 25, 1989.

### ON REHEARING

On Rehearing, Opinion No. 22824, filed January 25, 1988, is withdrawn and the following Opinion is substituted as the Opinion of the Court.

TOAL, Justice:

Kennedy brought this action for breach of implied warranty of habitability or fitness against Columbia Lumber arising from the sale of a new home. The trial judge directed a verdict for Columbia Lumber. We affirm.[1]

---

[1] The principles enunciated herein apply to all new residential construction, regardless of whether the purchaser obtains and holds legal title, *inter alia:* in his own name; in a corporate or partnership name; through a limited partnership; or by means of a horizontal property regime.

In 1976 Columbia Lumber sold building materials on credit to Charles Crumpton, d/b/a Rainbow Construction Company, for the construction of a house in Lexington County, South Carolina. Columbia Lumber did not participate in any way in the construction of the house, and was by appearance and in fact nothing more than a materials supplier.

After Crumpton had substantially completed the house, he encountered financial difficulties and could not pay his creditors, including Columbia Lumber. Crumpton then deeded the property to his mother, Cleo Crumpton, who assumed the mortgages. On October 11, 1976, Columbia Lumber filed a mechanic's lien on the property for its outstanding debt of $3,392.62. Instead of foreclosing on its lien, Columbia Lumber took title by deed, and paid off the lot and construction mortgages on the property.

Columbia Lumber then sold the house to Kennedy on July 21, 1977. The net proceeds from the sale were not enough to satisfy the debt owed by Crumpton to Columbia Lumber.

About six years after purchasing the house, Kennedy noticed a crack in the brick veneer at the rear of his house. Nearly two years after noticing the crack, Kennedy employed an engineer to estimate the cost of repairing it. The engineer opined that the crack was caused by a defective foundation. On September 27, 1985, Kennedy brought suit against Columbia Lumber on implied warranty of habitability and negligence theories. Kennedy's complaint was later amended to delete his cause of action for negligence.

## I. LENDER LIABILITY

The facts of this case fall between those involved in *Lane v. Trenholm Bldg. Co.*, 267 S. C. 497, 229 S. E. (2d) 728 (1976) and those involved in *Roundtree Villas Ass'n, Inc., v. 4701 Kings Corp.*, 282 S. C. 415, 321 S. E. (2d) 46 (1984). We hold that *Roundtree Villas* should be applied here to absolve the lender of liability under an implied warranty of habitability theory.

In *Lane*, the developer of a subdivision sold an undeveloped lot to a builder. The developer gained a second mortgage on a house subsequently built on the lot. The builder, experiencing financial problems, deeded the house

to the developer in satisfaction of its mortgage. The developer paid off the first mortgage on the house, and then sold it to Lane. Lane complained shortly thereafter about septic tank problems, and the developer endeavored to remedy them by ultimately installing a new septic tank. The repairs failed, and Lane brought suit, asserting the implied warranty of habitability.

We ruled in *Lane* that the developer was liable, citing our long held maxim of *caveat venditor*, and noting that one of the primary objectives of the law of contracts "is to carry out the reasonable expectations of the parties." *Lane*, 267 S. C. at 503, 229 S. E. (2d) at 730. While *Lane* is pertinent to the facts here, it is not fully controlling.

*Lane* differs from the instant case in that there the lender was also the developer of the subdivision. The developer's status as a lender was at most of secondary importance in the transaction. To have held against the buyer there would have been to frustrate his reasonable expectations when he entered the transaction.

Here, Columbia Lumber is merely a materials supplier, and sold in its capacity only as lender attempting to recoup its losses, which it never fully accomplished. Columbia Lumber became a seller only by virtue of the fact that it took a deed in lieu of foreclosure, and we find that *Lane* does not direct the disposition of the case at bar.[2]

In *Roundtree Villas*, a construction lender monitored a construction project to protect its loan investment to the builder. The builder sold several units of the project, but then faced insurmountable financial problems. The builder deeded the remaining units in the project, to prevent foreclosure, to a selling corporation created at the instigation of the lender. This selling corporation assumed the obligations owed by the builder to the lender. The lender undertook to repair defects in the remaining units in order to facilitate further sales by the seller corporation. Purchasers of these units brought suit upon discovering construction defects, asserting that the lender was liable under negligence and implied warranty of habitability theories.

---

[2] Since we find that *Lane* does not control here, we need not address Columbia Lumber's argument that the buyer has failed to assert his warranty claim within a reasonable time.

We held in *Roundtree Villas* that the lender could not be held liable in tort for construction defects caused by the builder's work. The monitoring by the lender was not enough to impose a legal duty on it to prevent construction defects. We agreed, however, that a duty on the lender to use due care did arise regarding the repair work it undertook. We further held that the lender was not a party to any sales of the units sufficient to incur liability under an implied warranty of habitability.

In *Roundtree Villas,* this Court did not address the warranty liability of a mere lender who sells a house, since there we found that the lender was not sufficiently a party to the sale. We now hold that a mere lender, even if a party to the sale, is ordinarily not liable under an implied warranty of habitability theory.

The public policy reasons for refusing to impose warranty liability on a mere lender are myriad. To require every lender to foreclose in order to shield itself from liability instead of taking a deed in lieu would be unduly burdensome on the state's judicial and administrative machinery. The imposition of warranty liability on all lenders/sellers would discourage lending, and thus economic growth. Further, it is unduly punitive to impose potential warranty liability on a lender that is searching for some way to recover the losses it has suffered due to the default of the debtor.

This is not to say that a lender will never incur implied warranty liability when it makes a sale after default. Obviously, a lender can be held liable if it is also a developer. *See* discussion of *Lane, supra. Roundtree Villas* establishes liability on lenders for defects in those portions of the house(s) which they complete. A lender will also incur liability for the performance of express representations made to a buyer. A lender should be held responsible if it is aware of defects but conceals them from an unwitting buyer. Liability may also attach when the lender becomes highly involved with construction in a manner that is not normal commercial practice for a lender. In such a situation, the lender might be said to be a joint venturer. *See generally Central Bank v. Baldwin,* 94 Nev. 581, 583 P. (2d) 1087 (1978). The lender may be liable if it is so amalgamated with the developer or builder so as to blur its legal distinction. *See*

*generally Kincaid v. Landing Dev. Corp.*, 289 S. C. 89, 344 S. E. (2d) 869 (Ct. App. 1986). A lender may also be liable where it forecloses on a developer in the midst of construction, takes title, has substantial involvement in completing the construction and sells homes. *See* Ferguson, *Lender's Liability for Construction Defects*, 11 Real Est. L. J. 310 (1983).

None of these possibilities for liability apply to Columbia Lumber. It therefore cannot be found responsible in the instant case and the trial court must be affirmed.

## II. BUILDER AND SELLER LIABILITY

Because this is the latest in a series of cases we have decided concerning theories of liability in new, residential housing, we take this opportunity to address the Court of Appeals' recent decision in *Carolina Winds Owners' Association, Inc. v. Joe Harden Builder, Inc.*, 297 S. C. 74, 374 S. E. (2d) 897 (Ct. App. 1988). To the degree herein indicated, we express our disapproval and rejection of that opinion.

There, a builder who was not also the seller of a condominium building was sued by a regime representing the purchasers. The regime, alleging cracking in the exterior facial brick walls of the building, pursued a negligence theory and an implied warranty of habitability theory against the builder.

The Court of Appeals held that the source of the implied warranty of habitability was the *sale* of a house, and since the builder was not a seller, he was not liable in warranty. Further, the Court of Appeals held that the "economic loss" rule served to prevent the imposition of tort liability on the builder. The "economic loss rule" simply states that there is no tort liability for a product defect if the damage suffered by the plaintiff is only to the product itself. In other words, tort liability only lies where the damage done is to other property or is personal injury.

While the Court of Appeals' reasoning in *Carolina Winds* appears to be a seamless web of proper legal analysis, the opinion reaches a result which is repugnant to the South Carolina policy of protecting the new home buyer. The result is that a builder who constructs defective housing escapes

liability while a group of innocent new home purchasers are denied relief because of the imposition of traditional and technical legal distinctions.

The law involving the purchase of new housing has been in a state of flux since the early nineteenth century. It has necessarily evolved to keep pace with the changing mechanics of an ordinary new home purchase.

In the early 1800s, the doctrine *caveat emptor* was developed by courts which determined that a "buyer deserved whatever he got if he relied on his own inspection of the merchandise and did not extract an express warranty from the seller." Roberts, *The Case of the Unwary Home Buyer: The Housing Merchant Did It*, 52 Cornell L.Q. 835, 836-37 (1967). Yet, this doctrine rarely worked a hardship on the common home buyer in those times. A middle-class home buyer typically bought an empty lot, then hired an architect to draw up plans for his home. The buyer then hired a contractor who was paid in installments as he completed each part of the house to the satisfaction of the architect. One of these two parties could easily be found liable to the buyer in the event of problems with construction. *Caveat emptor* applied to the relatively rare purchase of a new home already built. *Id.* at 837.

The first major step back from the rule of *caveat emptor* occurred in England. In *Miller v. Cannon Hill Estates, Ltd.*, (1931) 2 K.B. 113, the King's Bench held that where a home is bought in the midst of construction, there is an implied warranty by the builder-vendor that it will be completed in a workmanlike manner. The court there was faced with a set of facts falling between two settled bodies of common law: first, that where an owner hires a builder, there is an implied warranty that the construction will be workmanlike; and second, that the rule of *caveat emptor* applies to the sale of a completed home. The court wisely sided with the home buyer, protecting him from the defective construction of the builder-vendor. The court ruled that, under those facts, the builder-vendor was more of a "builder" than a "vendor" for the purposes of *caveat emptor* protection. *See* Roberts, *supra*, at 838.

After World War II, this English exception was adopted by courts in the United States. *See Vanderschrier v. Aaron,*

103 Ohio App. 340, 140 N. E. (2d) 819 (1957); and *Hoye v. Century Builders, Inc.,* 52 Wash. (2d) 830, 329 P. (2d) 474 (1958). The exception was broadened to encompass a builder-vendor's sale of a completed home in *Carpenter v. Donohoe,* 154 Colo. 78, 388 P. (2d) 399 (1964). We recognized that a builder-vendor of a new house gives his purchaser an implied warranty of fitness in *Rutledge v. Dodenhoff,* 254 S. C. 407, 175 S. E. (2d) 792 (1970). The result of this holding was to establish this implied warranty as an independent covenant which survives delivery of the deed. To this extent, *Rutledge* abrogated the doctrine of merger by deed.

The erosion of *caveat emptor* was spurred by the changes in the way new homes were being sold. The need for new housing dramatically increased after World War II, and a "new breed of superdeveloper" arrived on the scene to satisfy this need. Large numbers of homes were built on speculation. Buyers could no longer supervise construction. *See* Maldonado, *Builder Beware: Strict Tort Liability for Mass-Produced Housing,* 7 Real Est. L. J. 283, 286-87 (1979).

In *Lane v. Trenholm Building Co.,* 267 S. C. 497, 229 S. E. (2d) 728 (1976), we were faced with a set of facts—a developer/seller who did not also build the home—which was not adequately addressed by our existing rules protecting new home buyers. We therefore expanded our rules accordingly.

As previously outlined, in *Lane* we extended our rule to hold a developer liable in warranty for selling a new home, although he was not also the builder. In so doing, we discussed South Carolina's historic tendency to reject *caveat emptor* and to embrace the maxim *caveat venditor. See Timrod v. Shoolbred,* 1 Bay 324 (1793); *Champneys v. Johnson,* 2 Brevard 268 (1809); *Smith v. McCall,* 1 McCord 220 (1821). We have therefore taken judicial cognizance of the fact that a modern buyer of new residential housing is normally in an unequal bargaining position as against the seller. *See Terlinde v. Neely,* 275 S. C. 395, 398, 271 S. E. (2d) 768, 769 (1980).

The facts of *Carolina Winds* present yet one more scenario which is not properly disposed of by our present set of rules governing new home sales. The home buyer seeks to hold a builder responsible in negligence and warranty although the builder did not sell the home and the damages suffered were

of an economic nature. Once more, we respond by expanding our rules to provide the innocent buyer with protection.

We have made it clear that it would be intolerable to allow builders to place defective and inferior construction into the stream of commerce. *See Rogers v. Scyphers*, 251 S. C. 128, 135-36, 161 S. E. (2d) 81, 84 (1968). The practical difficulties facing today's new home buyer mandate that we allow a buyer to ordinarily proceed against both the builder and seller, or either of them. The buyer may obtain a single satisfaction in accordance with his determination of which of the parties can best respond to judgment.

## A. IMPLIED WARRANTY LIABILITY

Dealing with the factual situation presented in *Carolina Winds*, the Court of Appeals correctly held that our decision in *Arvai v. Shaw*, 289 S. C. 161, 345 S. E. (2d) 715 (1986) prevents the buyers from recovering on an implied warranty of habitability theory. *Arvai* and *Lane v. Trenholm Bldg. Co.*, 267 S. C. 497, 229 S. E. (2d) 728 (1976) indicate that, except with regard to a mere lender as discussed earlier herein, the warranty of habitability arises or springs from the sale of the home. This warranty can be used to impose liability on a seller, as in *Lane*, who is not also a builder.

However, the builder may not escape warranty liability by refraining from selling the building. As recognized by the Court of Appeals in *Carolina Winds*, a builder who contracts to construct a dwelling impliedly warrants that the work undertaken will be performed in a careful, diligent, workmanlike manner. *See Hill v. Polar Pantries*, 219 S. C. 263, 64 S. E. (2d) 885 (1951). This is an implied warranty of workmanlike service, and is distinct from the implied warranty of habitability.

The Court of Appeals characterized this warranty liability as "arising from the construction contract to which the builder is a party, not some subsequent contract of sale to which he is a stranger." *Carolina Winds*, 297 S. C. at 84, 374 S. E. (2d) at 903. We have been steadfast in holding that privity of contract as a defense to an implied warranty action is abolished in this State. *See, e.g., Terlinde*, 275 S. C. at 398, 271 S. E. (2d) at 769. In *JKT Co. v. Hard-*

*wick,* 274 S. C. 413, 417-18, 265 S. E. (2d) 510, 512-13 (1980), we stated:

> The erosion of the concept of privity has been a legal phenomenon for more than a decade, and this Court has not been reluctant to contribute to its demise.
>
> . . . .
>
> . . . [L]ack of privity as a defense to a cause of action has been of questionable vitality in South Carolina. Today, we seek to still all whispers of its continued existence.

Hence, a purchaser may sue a builder on his implied warranty of service, despite the purchaser's lack of contractual privity. Any contrary implication by the Court of Appeals in *Carolina Winds* is rejected.

## B. LIABILITY IN TORT

The Court of Appeals in *Carolina Winds* denied the plaintiff's tort claim by applying the "economic loss" rule. This rule exists to assist in determining whether contract or tort theories are applicable to a given case. Where a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "economic" losses. Conversely, where a purchaser buys a product which is defective and physically harms him, his remedy is in either tort or contract. This is so, the analysis provides, because his losses are more than merely "economic."

We find that this legal framework generates difficulties. This is so because the framework's focus is on consequence, not action. Builder "A" and Builder "B" can be equally blameworthy, and build equally shoddy housing, but because Builder "A"'s negligence happened to be discovered early enough, no one was harmed. It hardly seems fair that Builder "A" should profit from a diligent buyer's discovery, or because he was fortunate.

The framework we adopt focuses on activity, not consequence. If a builder performs construction in such a way that he violates a contractual duty *only*, then his liability is only contractual. If he acts in a way as to violate a legal duty, however, his liability is both in contract and in

tort. Where the builder's actions are grossly negligent, of course, punitive damages may be sought. We disagree with *Carolina Winds* insofar as it implies that no legal duties are owed a purchaser by a builder to protect against diminution in the expected value of the building.

The Court of Appeals itself correctly recognized in *Kincaid v. Landing Dev. Corp.*, 289 S. C. 89, 344 S. E. (2d) 869 (Ct. App. 1986) that a violation of a building code violates a legal duty for which a builder can be held liable in tort for proximately caused losses. *Terlinde*, 275 S. C. at 399, 271 S. E. (2d) at 770, imposes a legal duty on builders to undertake construction commensurate with industry standards. Where a building code or industry standard does not apply, public policy further demands the imposition of a legal duty on a builder to refrain from constructing housing that he knows or should know will pose serious risks of physical harm. We recognized such a duty, which should extend to foreseeable parties, in *Rogers*, 251 S. C. at 134, 161 S. E. (2d) at 84. We are persuaded that building a house which one knows or should know will later be sold by a party to an innocent buyer is an act adequate to constitute placing that house into the stream of commerce. Any builder who violates such a duty should justly be held accountable for the losses that his breach caused, whether they be physical harm or the dimunition in the value of the house.

A builder is no less blameworthy in such a case where lady luck has smiled upon him and no physical harm has yet occurred. We discounted the necessity of showing physical harm in *Terlinde*, 275 S. C. 395, 271 S. E. (2d) 768 (1980), in which we considered and declined to adopt arguments asserting the "economic loss" rule contained in the *Terlinde* briefs. In so ruling, we once again join those states which strive to protect the modern new home buyer. *See Barnes v. Mac Brown & Co.*, 264 Ind. 227, 342 N. E. (2d) 619 (1976); *Oates v. JAG, Inc.*, 314 N. C. 276, 333 S. E. (2d) 222 (1985); *Sewell v. Gregory*, 371 S. E. (2d) 82 (W. Va. 1988); *Village Cross Keys Inc. v. The United States Gypsum Co.*, 315 Md. 741, 556 A. (2d) 1126 (1989); *New Mea Construction Corp. v. Harper*, 203 N. J. Super. 486, 497 A. (2d) 534 (1985); *Huang v. Garner*, 157 Cal. App. (3d) 404, 203 Cal. Rptr. 800 (1984).

Thus, a cause of action in negligence will be available where a builder has violated a legal duty, no matter the type of resulting damage. The "economic loss" rule will still apply where duties are created *solely* by contract.[3] In that situation, no cause of action in negligence will lie.

### III. CONCLUSION

In summation, we hold that:

A. A mere lender is not liable for breaching the implied warranty of habitability by simply taking a deed in lieu of foreclosure and selling a house to recoup its losses.

B. An implied warranty of service attaches to a builder's construction of new residential housing. A home buyer purchasing from a party not the builder may ordinarily sue the builder on this warranty despite the lack of contractual privity.

C. A builder may be liable to a home buyer in tort despite the fact that the buyer suffered only "economic losses" where: (1) the builder has violated an applicable building code; (2) the builder has deviated from industry standards; or (3) the builder has constructed housing that he knows or should know will pose serious risks of physical harm.

Affirmed.

GREGORY, C. J., and HARWELL, CHANDLER and FINNEY, JJ., concur.

---

[3] An example of such a situation might be where the buyer contracted for blue paint but instead received brown.