666 S.E.2d 247

**COLLETON PREPARATORY ACADEMY, INC., Plaintiff,**

.v.

**HOOVER UNIVERSAL, INC., Defendant.**

**No. 26535.**

Supreme Court of South Carolina.

Heard Sept. 19, 2007.

Decided Aug. 25, 2008.

182

Charles Hiram Williams, II, of Williams & Williams, of Orangeburg, for Plaintiff.

Charles J. Baker, III, of Buist, Moore, Smythe & McGee, of Charleston; and Richard Kenneth Wray and Casey L. Westover, both of Reed Smith, of Chicago, IL, for Defendant.

C. Mitchell Brown and William C. Wood, Jr., of Nelson Mullins Riley & Scarborough, of Columbia, for Amicus Curiae Product Liability Advisory Council, Inc.

Saunders M. Bridges, Jr., of Aiken, Bridges, Nunn, Elliott & Tyler, of Florence, for Amicus Curiae Beazer Fast Food, Inc. and Osmose, Inc.

Justice BEATTY.

We accepted two questions certified by the United States District Court for South Carolina pursuant to Rule 228, SCACR. The questions involve recovery in tort in light of the economic loss doctrine and recovery under the South Carolina Unfair Trade Practices Act (UTPA) for a remote user. After careful consideration, we answer the first question "no," and "yes." We answer the second question, "yes."

## FACTS

Plaintiff Colleton Preparatory Academy is a private school in Walterboro, South Carolina.[1] The roof of Plaintiff's administration building was constructed in 1972, and the building's roof truss system contained wood treated with "Fire–X," a fire retardant manufactured by Defendant Hoover's predecessor. In 2002, Plaintiff discovered the fire retardant treated (FRT) wood was deteriorating, causing failure of numerous chord and web members, corrosion to the metal truss connection plates, deterioration of the roof sheathing, and loss of strength of

---

1. The facts are substantially taken from the district court's February 27, 2007 order certifying the two questions to this Court.

structural wood members. The deterioration of the FRT wood caused structural problems which would eventually lead to truss failure and partial or full roof collapse. The majority of the roof trusses and sheathing had failed or were about to fail, the roof framing and sheathing were substantially impaired, and the truss system had to be replaced for safety reasons.

Plaintiff filed an action in the United States District Court for the District of South Carolina against Defendant seeking damages caused by the deterioration of the wood under theories of negligence, reckless/gross negligence, and violation of the UTPA. Defendant failed to answer and was held in default. The district court denied the motion to set aside the default and made the following findings: (1) Defendant's product was defective and unreasonably dangerous for its foreseeable use because of the structural lumber's propensity to lose strength; (2) Defendant was negligent or reckless in advertising and marketing the FRT lumber to building code officials, architects, truss manufacturers, and end users when it knew or should have known the product was defective or unsuitable for use under foreseeable conditions; (3) Defendant failed to provide adequate updates and warnings; (4) Defendant admitted by its default and evidence introduced at the damages hearing supported a conclusion that the FRT lumber posed a serious risk of bodily harm; (5) Defendant admitted by its default, and evidence introduced at the damages hearing supported a conclusion, that it had a duty to insure the product met or exceeded industry standards and it violated that duty by manufacturing and selling a product that was unreasonably dangerous; (6) for purposes of the UTPA, Defendant's actions were unfair, capable of repetition, and injurious to the public, and Defendant knew the FRT lumber was unsuitable for its advertised use and it resulted in damages to Plaintiff; and (7) although there is no evidence that Plaintiff dealt directly with Defendant, Defendant admitted by its default that it marketed the product to end users when it knew or should have known it was defective and unsuitable for use under foreseeable conditions in roofing systems.

After a bench trial, the district court awarded Plaintiff $871,619.15 in damages under the UTPA claim to cover the cost of repairs to the roof trusses and temporary classroom

expenses.[2] The district court held that the economic loss rule barred Plaintiff from recovering under a negligence theory because the FRT wood was causing damage only to itself and not to persons or property. After both parties filed for reconsideration, the district court filed an order on January 31, 2006, requesting certification of questions regarding exceptions to the economic loss doctrine and the necessity of privity in a UTPA claim. After considering the motions for reconsideration and Plaintiff's motion to amend the order of certification, the district court issued an order on February 27, 2007, modifying the January 31, 2006 order to include the current version of the two certified questions. This Court accepted the certified questions.

## STANDARD OF REVIEW

 In answering a certified question raising a novel question of law, the Court is free to decide the question based on its assessment of which answer and reasoning would best comport with the law and public policies of the state as well as the Court's sense of law, justice, and right. *McCullough v. Goodrich & Pennington Mortgage Fund, Inc.*, 373 S.C. 43, 47, 644 S.E.2d 43, 46 (2007); *Howell v. United States Fid. & Guar. Ins. Co.*, 370 S.C. 505, 508, 636 S.E.2d 626, 627 (2006); *Peagler v. USAA Ins. Co.*, 368 S.C. 153, 157, 628 S.E.2d 475, 477 (2006).

## CERTIFIED QUESTIONS

(1) Can the user of a defective product recover in tort when only the product itself has been injured and when the product either violated generally accepted industry standards or posed a serious risk of bodily harm?

(2) Can a plaintiff who used but did not purchase a product directly from the defendant and nonetheless suffered a loss as a result of the defendant's unfair or deceptive acts obtain relief under the South Carolina Unfair Trade Practices Act?

---

2. If the repairs to the roof could be completed during the summer, the order held the damages award would be reduced to $690,158.62 because the temporary expenses could be avoided.

## DISCUSSION

### I. Economic Loss Doctrine

The first certified question does not specifically mention the economic loss doctrine. However, it is clear from the district court's order and language used in the question that the district court seeks clarification regarding whether the legal duties [3] to conform to industry standards and to avoid creating a serious risk of bodily harm found in *Kennedy v. Columbia Lumber & Manufacturing Company*, 299 S.C. 335, 384 S.E.2d 730 (1989), are limited to the residential housing arena or whether they have wider application.

Initially, we note that in *Kennedy,* this Court held "a cause of action in negligence will be available where a builder has violated a legal duty, no matter the type of resulting damage. The 'economic loss' rule will still apply where duties are created *solely* by contract. In that situation, no cause of action in negligence will lie." *Kennedy,* 299 S.C. at 347, 384 S.E.2d at 737; *see Dorrell v. South Carolina Dep't of Transp.,* 361 S.C. 312, 318, 605 S.E.2d 12, 15 (2004) (noting paving company's contract with the State did not limit its liability in negligence to third parties because the common law duty of due care existed outside of the contract).

The purpose of the economic loss rule is to define the line between tort and contract recovery. *Kennedy,* 299 S.C. at 345, 384 S.E.2d at 736 ("This rule exists to assist in determining whether contract or tort theories are applicable to a given case."). The economic loss rule generally provides there is no tort liability for a defective product if the product damages only itself. *Id.* at 341, 384 S.E.2d at 734. "Where a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only 'economic' losses." *Id.* at 345, 384 S.E.2d at 736. However, where a defective product harms other property or causes physical injury, the losses are more than merely economic, the economic loss rule is inapplicable, and a remedy lies in either tort or contract. *Id.; Kershaw County Bd. of Educ. v. United States Gypsum Co.,*

---

**3.** These legal duties have also been referred to as "exceptions" to the economic loss doctrine.

302 S.C. 390, 393, 396 S.E.2d 369, 371 (1990) (finding the economic loss doctrine did not bar recovery in an asbestos case because the defective product caused harm to "other property," including the rest of the building).[4]

This Court has continually expressed uneasiness with the economic loss doctrine. The majority view of the doctrine employs a legal framework that focuses on consequence, not action.[5] We have said that this framework generates difficulties. As a result, we partially rejected the rule in the residential home building context, leaving it viable in situations where a builder violates only a contractual duty. *Kennedy,* 299 S.C. at 344, 384 S.E.2d at 736; *Kershaw,* 302 S.C. at 393, 396 S.E.2d at 371. Although the economic loss rule bars tort recovery where duties are created solely by contract, we have long recognized tort actions for purely economic losses as a result of a breach of a special legal duty outside the contract. *See Tommy L. Griffin Plumbing & Heating v. Jordan, Jones & Goulding, Inc.,* 320 S.C. 49, 55, 463 S.E.2d 85, 88–89 (1995) (finding design professionals, including engineers, may have a duty separate and distinct from contractual duties such that the economic loss doctrine would not prohibit a tort action); *Beachwalk Villas Condo. Ass'n v. Martin,* 305 S.C. 144, 146–47, 406 S.E.2d 372, 374 (1991) (finding a special duty for architects); *Kennedy,* 299 S.C. at 347, 384 S.E.2d at 738

4. The question as posited by the district court is interesting in that the record reflects that the FRT wood damaged more than itself. It appears to have actually damaged metal truss connection plates and the roof sheathing. That being the case, the economic loss rule would be inapplicable. *Kershaw,* 302 S.C. at 393, 396 S.E.2d at 371.

5. The majority rule provides it is the consequence, *i.e.,* the nature of the actual loss, that is important in determining whether relief lies in tort. *See East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 869–72, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (rejecting minority economic loss view that manufacturers have a duty to make non-defective products and are liable in tort, whether or not the defect created an unreasonable risk of harm; rejecting the intermediate approach that tort recovery turns on the risk of harm by a defective product; and adopting the majority rule that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself" in an admiralty case); *Restatement (Third) of Torts* § 21 cmt. d (1998) (noting that a strong majority of courts follow the East River interpretation of the economic loss rule).

(finding builders owe three legal duties to home buyers beyond the contract); *Lloyd v. Walters,* 276 S.C. 223, 226, 277 S.E.2d 888, 889 (1981) (finding an attorney liable for economic loss to a corporate shareholder when attorney breached a duty to the corporation); *Georganne Apparel v. Todd,* 303 S.C. 87, 92, 399 S.E.2d 16, 18–19 (Ct.App.1990) (dismissing an accountant malpractice case for failure to prosecute); *but see McCullough v. Goodrich & Pennington Mortgage Fund, Inc.,* 373 S.C. 43, 53, 644 S.E.2d 43, 49 (2007) (rejecting the notion of a special duty in the secured transactions arena).

■ In *Kennedy,* we adopted a framework that changed the focus of the inquiry from the consequences of the alleged tortfeasor's actions to whether or not the alleged tortfeasor acted in a way that violated a legal duty aside from his contractual duties. If the act violates a contractual duty only, then the liability is in contract; however, if the act violates a non-contractual legal duty, then the liability is both in contract and tort. *Kennedy,* 299 S.C. at 345–46, 384 S.E.2d at 737. This change in analytical focus did not totally eviscerate the economic loss rule; however, the rule is now less restrictive.

We turn now to whether the legal duties found in *Kennedy* are applicable outside of the residential home building area generally.

### *Violation of Industry Standards*[6]

Evidence of industry standards has been recognized by this Court as highly probative on the issue of defining the duty of care. *Elledge v. Richland/Lexington Sch. Dist. Five,* 352 S.C. 179, 189, 573 S.E.2d 789, 795 (2002).

In *Kennedy,* we considered the public policy of protecting new home buyers from builders who "place defective and inferior construction into the stream of commerce." *Kennedy,* 299 S.C. at 344, 384 S.E.2d at 736. We found a builder owes legal duties to a home buyer beyond the contract, and thus, a builder could be liable in tort for purely economic losses, where: "(1) the builder has violated an applicable building code; (2) the builder has deviated from industry standards; or

---

6. A "standard" is a "model accepted as correct by custom, consent, or authority ... a criterion for measuring acceptability, quality, or accuracy." *Blacks Law Dictionary* 1412–13 (7th ed.1999).

(3) the builder has constructed housing he knows or should know will pose a serious risk of physical harm." *Id.* at 347, 384 S.E.2d at 738.

The *Kennedy* court concluded that an expansion in traditional concepts of tort duty was needed in order to provide the innocent home buyer with protection. *Kennedy,* 299 S.C. at 343, 384 S.E.2d at 735. The court noted the inherent unequal bargaining positions, the fact that buyers no longer supervised construction of their homes, and South Carolina's acceptance of the legal maxim *caveat venditor.* *Id.* at 343, 384 S.E.2d at 735.

The same policy considerations noted in *Kennedy* are arguably not present in the commercial construction arena. However, in *Kennedy* we expressed our approval of the legal maxim *caveat venditor* and recognized a new framework for analysis that focused on the actor's actions, not consequences. In our view this analytical framework is universal. Again, focusing on whether or not the actor violated a non-contractual duty does not eviscerate the economic loss doctrine; it only determines its applicability to the case presented.

██ By focusing on the actor's actions in *Kennedy,* we concluded that builders have a legal duty outside of the contract to make products that meet industry standards. *Kennedy,* 299 S.C. at 347, 384 S.E.2d at 738. This Court has also stated that if a user of a product is a member of the class for which the product was manufactured, the user is entitled to a duty of care in manufacturing commensurate with industry standards. *Terlinde v. Neely,* 275 S.C. 395, 399, 271 S.E.2d 768, 769 (1980) ("The plaintiffs, being a member of the class for which the home was constructed, are entitled to a duty of care in construction commensurate with industry standards."). However, this Court will not extend the concept of a legal duty of care in tort liability beyond reasonable limits. *See McCullough,* 373 S.C. at 53, 644 S.E.2d at 49 (rejecting the notion of a special duty in the secured transactions arena). Industry standards are probative in *defining* the standard or duty of care; however, industry standards do not *determine* if the prerequisite duty of care is *owed.* In other words, a violation of industry standards is only helpful in determining that a duty owed has been breached.

■ In the instant case, assuming that a duty of care is owed to Colleton, a breach of industry standards would serve as evidence of Hoover's breach of that duty of care. Being that the duty of care does not arise out of a contract, the fact that only the product itself is injured is irrelevant. *Kennedy* dictates that the focus of the inquiry is on Hoover's action, not the consequence of the action. Thus, the economic loss rule is not applicable and would not bar recovery in tort.

### Risk of Serious Bodily Harm

■ In light of our framework of focusing on activity, not just consequences, it is our view that parties should not have to wait until a dangerous and defective product causes serious bodily injury before seeking a tort action. In this regard, we see no reason to treat commercial parties differently from home buyers or other consumers. *See JKT Co. v. Hardwick*, 274 S.C. 413, 418, 265 S.E.2d 510, 512 (1980) (noting that there is "no justifiable reason why an innocent corporate consumer should be denied recovery [for lack of privity in an implied warranty action] when a manufacturer places a defective article into commerce"). Extending the legal duty to manufacture products that do not pose a "serious threat of physical harm" to the commercial context would protect commercial plaintiffs in the same way we sought to protect home buyers: a manufacturer placing a dangerous, defective product into the stream of commerce would not unfairly escape liability because only the defective product was injured and no one was seriously hurt. Further, the traditional lines between tort and contract are not blurred by our decision because tort liability for purely economic losses only attaches where there is a breach of these legal duties beyond the contractual duties. *Kennedy*, 299 S.C. at 345–46, 384 S.E.2d at 737.

■ Extending the serious threat of physical (bodily) harm exception generally is consistent with our policy of providing a remedy where a duty outside the contract is breached. Manufacturers have a duty, separate and apart from contractual duties, to create safe products, and they are liable for poorly made products used in a foreseeable manner. *See Salladin v. Tellis*, 247 S.C. 267, 269–71, 146 S.E.2d 875, 876–77 (1966) (noting a manufacturer of an imminently dangerous product is liable in tort for physical harm caused, regardless of whether

the injured party is in privity of contract, when put to its intended use). Other jurisdictions providing an exception where a defective product poses a serious threat of physical harm have expressed the same concerns regarding protecting an injured party in a general commercial context from a fortuitous tortfeasor that we expressed in *Kennedy*. *See Morris v. Osmose Wood Pres.*, 340 Md. 519, 667 A.2d 624, 631–32 (1994) (noting that, while not proven by the parties, Maryland nevertheless allows recovery for purely economic losses where it is shown that there is a clear danger of death or serious injury); *Council of Co–Owners v. Whiting–Turner*, 308 Md. 18, 517 A.2d 336, 345 (1986) (focusing on the duty owed in an economic loss case, rather than on the "fortuitous circumstance of the nature of the resultant damage," and finding that one could recover in tort for purely economic losses "where the risk is of death or personal injury");[7] *see also Philadelphia Nat'l Bank v. Dow Chem. Co.*, 605 F.Supp. 60, 64 (E.D.Pa.1985) ("*PNB* ") (noting that while the court was reluctant to rely solely on evidence of damage to other property, the court found Pennsylvania would allow recovery in strict liability because there was also evidence that the defective product posed a serious risk to passers-by); *Trustees of Columbia Univ. v. Mitchell/Giurgola Assocs.*, 109 A.D.2d 449, 492 N.Y.S.2d 371, 376 (N.Y.App.Div.1985) ("*Columbia* ") (finding that the economic loss rule did not bar recovery, and the codefendants were entitled to contribution from supplier, because a "wall rendered defective and in imminent danger of collapse by improperly fabricated materials constitutes the type of dangerous product for which the manufacturer owes a duty to the ultimate user under the doctrine of strict liability bespeaks itself").[8]

---

**7.** The South Carolina Court of Appeals originally rejected the Maryland court's analysis in *Whiting–Turner* in its decision in *Carolina Winds Owners' Ass'n v. Joe Harden Builder, Inc.*, 297 S.C. 74, 85–88, 374 S.E.2d 897, 905–06 (Ct.App.1988). However, since this Court's over-ruling of Carolina Winds by our decision in *Kennedy*, 299 S.C. 335, 384 S.E.2d 730, our focus has been on the legal duties owed and our concern with the difficulties posed, by the economic loss doctrine.

**8.** We respectfully disagree with the dissent's reading of *PNB* and *Columbia*. The risk of physical injury played a role in finding strict liability in both cases. While the parties in *PNB* acknowledged the general rule that negligence and strict liability could not be imposed for

 We are mindful that extending the serious threat of harm exception may raise concerns that manufacturers would essentially become insurers against every remote threat of harm. This is not our intent, and we emphasize that the exception applies to *serious* threats with recovery calculated as the costs to repair or remove the dangerous product.[9] In order to limit situations where the exception applies, we adopt Maryland's balancing test: the nature of the damage threatened and the probability that the damage would occur should be examined to determine whether there is a "clear, serious,

---

mere economic losses, the court went on to find strict liability where there was some evidence of damage to components and the defective construction caused a "real, unspeculated risk of harm to passers-by on the street below." *PNB*, 605 F.Supp. at 64. In *Columbia*, the installers of a wall that was in danger of crumbling on a busy university campus appealed the lower court's rulings that the supplier could not be held accountable under the doctrines of indemnity and contribution. The plaintiff in the case did not appeal a prior court's ruling that the economic loss doctrine barred its action against supplier. The *Columbia* court found that it was not bound by the law of the case in that particular procedural posture, and found that the economic loss doctrine would, in fact, not bar recovery because the supplier owed a duty to supply safe products. While the court found the supplier was not liable for indemnity, it held that supplier was liable for contribution because the defective materials supplied by supplier damaged the wall and posed an unduly dangerous condition for which damages under strict liability may be maintained. *Columbia*, 492 N.Y.S.2d at 376. Thus, the court noted that while the plaintiff was unable to recover directly against the supplier because it did not appeal the prior court's findings that supplier had no duties under strict liability, the supplier was still liable for contribution because there was actually a duty owed. *Id.* at 377.

In the instant case, the dissent's reasoning would require that Colleton refrain from taking any remedial action and allow the roof to collapse, potentially causing death and serious bodily injury. This would be an unnecessary and unacceptable price to pay for the protection of the economic loss rule; a rule that is falling out of judicial favor in this state and other jurisdictions. As for the dissent's concern for the use of "foreign cases" in our analysis, we are reminded that this is a case of first impression in this state. We also note the dissent's use of cases from California and the 6th Circuit in its analysis.

9. *See* Matthew W. Gissendanner, *Tort Recovery for Defective Products Posing a Threat of Bodily Harm: An Exception to the Economic Loss Rule?*, 57 S.C.L.Rev. 619, 621–23 (2006) (predicting whether this Court will extend exceptions to the economic loss rule and proposing the damages could be calculated as the costs associated with replacing the defective product).

and unreasonable risk of death or personal injury." *Morris,* 667 A.2d at 631–32 ("We examine both the nature of the damage threatened and the probability of damage occurring to determine whether the two, viewed together, exhibit a clear, serious, and unreasonable risk of death or personal injury. Thus, if the possible injury is extraordinarily severe, i.e., multiple deaths, we do not require the probability of the injury occurring to be as high as we would require if the injury threatened were less severe, i.e., a broken leg or damage to property."). For the foregoing reasons, we conclude the legal duties to avoid making products which pose a serious risk of physical injury as found in *Kennedy,* extend to manufacturers.

Accordingly, we answer the first certified question, "no," if there is merely a breach of industry standards without an accompanying breach of a legal duty owed, and "yes," if there is a breach of duty accompanied by a clear, serious and unreasonable risk of bodily injury or death.

## II. UTPA

▇▇▇ In the order requesting certification, the district court asked for clarification regarding whether a remote purchaser may maintain a UTPA suit. Based on the way this question is posed, we answer, "yes."

▇▇▇ Under the UTPA, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. S.C.Code Ann. § 39–5–20(a) (1985). Persons or any legal entity suffering an ascertainable loss of money or real or personal property "*as a result of* the use or employment by another person of an unfair or deceptive method, act or practice" may bring an action to recover actual damages. S.C.Code Ann. § 39–5–140(a) (1985) (emphasis added). To recover under the Act, a plaintiff must prove a violation of the Act, proximate cause, and damages. *Charleston Lumber Co. v. Miller Housing Corp.,* 318 S.C. 471, 482, 458 S.E.2d 431, 438 (Ct.App.1995).

In their UTPA discussions, the district court and the parties to this action focus primarily on *Reynolds v. Ryland Group, Incorporated,* 340 S.C. 331, 531 S.E.2d 917 (2000), and request clarification of whether this case holds a general privity requirement for UTPA claims. In *Reynolds,* this

Court answered the following certified question from the district court: "Under South Carolina law, can Plaintiffs in a residential construction defects case sue Defendant builder, seller and developer under the South Carolina Unfair Trade Practices Act if Plaintiffs did not purchase their residences from Defendant but from the original homeowner more than three years after the original sale?" *Reynolds*, 340 S.C. at 333, 531 S.E.2d at 918. The *Reynolds* court discussed a Texas causation case and acknowledged there was no specific provision in UTPA limiting a cause of action to an immediate purchaser. In discussing the plaintiff's request that the Court find privity of contract was not required in a UTPA claim by a subsequent purchaser, the *Reynold's* court noted that it "has taken a very active role in the construction area to protect innocent purchasers" including "the elimination of privity to protect an innocent purchaser who has invested his life savings from latent defects in a mobile society where it is foreseeable that more than the original owner will enjoy a home from a builder." *Reynolds*, 340 S.C. at 334, 531 S.E.2d at 919. However, the Court answered the certified question in the negative, noting that subsequent purchasers had other remedies against the builder in tort, negligence, and implied warranties. *Reynolds*, 340 S.C. at 335, 531 S.E.2d at 919–20. The dissent in *Reynolds* pointed out that: the plain meaning of the UTPA statute did not limit remedies to the initial purchaser; requiring privity would contravene South Carolina's long policy of protecting home owners and prior precedent stating the privity requirement was abolished;[10] imposing a privity requirement would bar UTPA suits by competitors; and the lack of a privity requirement would not lessen a plaintiff's need to prove a causal connection between the deceptive practices and their injury. *Reynolds*, 340 S.C. at 336–39, 531 S.E.2d at 920–22 (Burnett, J., dissenting).

In answering the certified question, the *Reynolds* Court did not: impart any particular legal theory to deny UTPA actions to subsequent home buyers; use the word "privity" in its ruling or pronounce that all UTPA actions required privity; or

---

10. *JKT Co.*, 274 S.C. at 417, 265 S.E.2d at 512 (stating "[w]e do not believe the doctrine of privity in South Carolina has sufficient vitality to permit its resuscitation by Celotex as a bar to JKT's recovery").

offer guidance as to UTPA claims by remote purchasers or competing entities generally. *Id. Reynolds* focused on a subsequent purchaser's ability or options to prove his losses were the result of the original builder's deceptive trade practice. As the dissent in *Reynolds* pointed out, to hold privity is required before a party may maintain a UTPA action would lead to an absurd result. Such a finding would prohibit UTPA actions by all remote buyers and competitors, who have traditionally been allowed to proceed under the Act, because there could be no privity. *See Global Prot. Corp. v. Halbersberg*, 332 S.C. 149, 156–57, 503 S.E.2d 483, 487 (Ct.App.1998) (allowing recovery in a UTPA claim between competitors for trademark infringement).

Accordingly, we answer the second certified question, "yes."

**CERTIFIED QUESTIONS ANSWERED.**

MOORE, ACTING CHIEF JUSTICE and WALLER, J., concur. PLEICONES, J. concurring in part and dissenting in part in a separate opinion in which Acting Justice E.C. BURNETT, III, concurs.

Justice PLEICONES.

I respectfully concur in part and dissent in part. I agree with the majority that a mere breach of industry standards does not give rise to a tort action, and, further, that the second certified question should be answered "yes." As explained below, I do not join the majority's ruling which would extend the narrow exception to the economic loss rule created in *Kennedy v. Columbia Lumber and Mfg. Co., Inc.*, 299 S.C. 335, 384 S.E.2d 730 (1989) to all tort-based products liability suits where the plaintiff alleges "only the product itself has been injured and [that the] product ... posed a serious risk of bodily harm."

Three theories of liability are available to an individual in South Carolina who has suffered a loss as the result of a defective product: breach of warranty, which sounds in contract, and strict liability and negligence, both of which sound in tort. Only warranty and negligence are discussed here.

A negligence products liability claim is premised on a breach of a duty of care resulting in damage to person or

property, giving rise to a claim for restorative money damages. While the law of contracts protects a party's expectation that a promise will be fulfilled, negligence awards money damages to restore a person who has suffered a loss.

The economic loss rule emerged from modern products liability law and serves to delineate tort and contract law. *See Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). The rule states that a tort action for a defective product does not lie unless there is a claim of personal injury or injury to other property of the plaintiff. Where the damage is merely diminution in the product's value, the remedy is in contract for breach of warranty, whether the diminished value is the result of inferior quality, unfitness for intended use, deterioration or destruction by reason of the defect. As Chief Justice Traynor explained in *Seely:*

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone.

63 Cal.2d at 18, 45 Cal.Rptr. 17, 403 P.2d at 151.

In *Kennedy v. Columbia Lumber and Mfg. Co. Inc.*, (*Kennedy* ), *supra*, this Court overruled a decision by the Court of Appeals, *Carolina Winds Owners' Ass'n v. Joe Harden Bldr.*,

297 S.C. 74, 374 S.E.2d 897 (Ct.App.1988). In *Kennedy*, the Court held a cause of action in negligence is available to a new home buyer who has suffered only economic loss to the home itself where the builder has (1) violated an applicable building code; (2) violated industry standards; or (3) constructed housing that he knows or should know will pose serious risks of physical harm. The Court characterized its decision as creating a different approach to the economic loss rule, holding that a builder should be liable in negligence for diminution in value even if only the product is harmed. To date, the Court has not expanded this approach to the economic loss rule beyond the residential purchaser/builder context.[11]

The present case asks whether the Court will extend the *Kennedy* exception beyond the home buyer/builder sphere. **On its facts,**[12] this case asks whether the owner (not buyer) of a new commercial (not residential) building may sue a material suppler (not builder or seller) in negligence where only the material has been injured.[13]

I begin by noting that in the residential home cases, the Court has considered the "product" to be the new home: heretofore, there has been no suggestion that we would entertain a products liability suit by the user against the manufacturer of the product components (i.e. the lumber) rather than against the manufacturer of the product (i.e. the builder). *See Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845 (6th Cir.2002) (applying Kentucky law and finding that the wood and fire retardant chemicals applied to it would not be a product severable from the building as a whole).

Second, the plaintiff here is not a new home buyer or even a new commercial buyer but rather a commercial entity which

---

11. Both *Beachwalk Villas Condo. Ass'n Inc. v. Martin*, 305 S.C. 144, 406 S.E.2d 372 (1991) and *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 320 S.C. 49, 463 S.E.2d 85 (1995) are in the nature of design professional "malpractice" cases. *See Hill v. Polar Pantries*, 219 S.C. 263, 64 S.E.2d 885 (1951).

12. As explained *infra*, the actual question posed, by its express terms, applies to all defective product cases.

13. While the facts suggest that more than the FRT has been damaged, the certified question is premised on damage only to that product.

commissioned a new building. None of the special policy concerns which underlie the Court's jurisprudence extending warranties and negligence remedies to new home buyers exist here. *Cf. Smith v. Breedlove,* 377 S.C. 415, 661 S.E.2d 67 (2008) (declining to extend warranties implied in home sale where seller/builder was not a professional but had acted as his own general contractor in constructing family home).

Aside from the novel policy questions posed by the facts of this case, the actual question posed by the district court is much broader:

> Can the user of a defective product recover in tort when only the product itself has been injured and when the product either violated generally acceptable industry standards or posed a serious risk of bodily injury?

To answer this question even partly in the affirmative works a wholesale revision of the law of products liability, and erases important distinctions between contract (warranty) and negligence (tort).

I am not persuaded by the majority's reasoning that we should effect such a major change in the law of products liability. The majority opinion first focuses on what it perceives as the similarities between commercial construction and residential construction, and next cites three foreign cases to support the extension of the *Kennedy* exception to the economic loss rule to commercial builders. As explained below, none of the three cases actually support this extension.

Two of the cases cited by the majority for the proposition that the commercial plaintiffs were able to recover economic losses in a construction setting are *Philadelphia Nat'l Bank v. Dow Chem. Co.,* 605 F.Supp. 60 (E.D.Pa.1985) and *Trustees of Columbia Univ. v. Mitchell/Giurgola Assocs.,* 109 A.D.2d 449, 492 N.Y.S.2d 371 (N.Y.App.Div.1985). The federal decision in *Philadelphia Nat'l Bank,* applying Pennsylvania law, contains this concession:

> The parties agree that under Pennsylvania law no negligence or strict liability may be imposed for mere economic loss.

In the other case, *Trustees of Columbia University,* the holding was that while the manufacturer breached its duty to the user under the doctrine of strict liability, the user's

recovery for its losses was barred by the economic loss rule. *Id.* at 376–377. Both cases in fact apply the economic loss rule to bar a tort recovery in a commercial construction setting.

The third case is from Maryland. Maryland, like South Carolina in *Kennedy*, recognizes an exception to the economic loss rule in a residential construction case. That jurisdiction held that where the builder's negligent conduct created a clear risk of death or personal injury, an action will lie in negligence for recovery of the reasonable cost of correcting the dangerous condition. *Council of Co–Owners Atlantis Condo., Inc. v. Whiting–Turner Contracting,* 308 Md. 18, 517 A.2d 336 (1986). In the later Maryland case cited by the majority, the Maryland court did indicate a willingness to extend the economic loss exception and recognize a duty where a defective **component** in a **residential** building created a risk of death or personal injury. *Morris v. Osmose Wood Preserving,* 340 Md. 519, 667 A.2d 624 (1995). The *Morris* court clarified the threshold for the application of such an exception:

> We examine both the nature of the damage threatened and the probability of damage occurring to determine whether the two, viewed together, exhibit a clear, serious, and unreasonable risk of death or personal injury. Thus, if the possible injury is extraordinarily severe, i.e., multiple deaths, we do not require the probability of the injury occurring to be as high as we would require if the injury threatened were less severe, i.e. a broken leg or damage to property. Likewise, if the probability of the injury occurring is extraordinarily high we do not require the injury to be as severe as we would if the probability of injury were lower.[14]
> *Id.* at 533, 667 A.2d at 631–632.

The *Morris* court found, however, that the allegations in that case did not pose a serious risk of death and personal injury, and affirmed the dismissal of the plaintiffs' claims. As in the present case, the *Morris* suit sought to recover "the cost of replacing roofs that contained allegedly defective fire retardant treated plywood," and the complaint asserted that the roofs had undergone a chemical reaction, "significantly weakening the roof and resulting in substantial impairment of the strength and structural integrity of the roofs. . . ." The

---

**14.** This balancing test would be used under the majority opinion.

*Morris* court upheld the dismissal of the complaint, finding that the roof work did not meet the threshold requirement of alleging "the existence of a clear danger of death or serious personal injury." *Id.* As I read these three cases, none support the extension of *Kennedy*'s exception to the economic loss rule to commercial construction.

After relying upon the perceived similarities between residential and commercial construction, three foreign decisions, and adopting the Maryland court's balancing test, the majority holds not simply that the *Kennedy* exception will be expanded to include commercial construction, but rather that "a user of a defective product can recover in tort [even] if only the product has been injured if that product poses a serious risk of bodily harm." I respectfully submit there is simply no analysis to support this unprecedented decision, which would rewrite the law of products liability.

In my opinion, the extension of the *Kennedy* exception to the economic loss rule to commercial builders, much less to all manufacturers, is unprecedented, unwarranted, and unwise. I am much persuaded by the reasoning of the late Justice-elect Bell who cautioned against permitting negligence actions where there is neither personal nor property injury because:

(1) it is not a tort to create risk, only to cause damage;

(2) the quantum of damage is unknowable until injury occurs; to allow repair damages in negligence may not represent the true loss if injury were to occur, and is manifestly speculative;

(3) to impose liability without damages makes the manufacturer of the product an insurer against all possible risk of harm; and

(4) there is no principled way to categorize types or degrees of risk for the purpose of establishing liability. To adopt an *ad hoc* approach is "to abandon the attempt at rule governed decision making ... [t]he calculation of risk is a complex, fact intensive, infinitely varied, and inevitably imprecise process. It is far beyond the competence of judges and juries. Even if all risks could be foreseen and precisely calculated, there would still be no certain, predictable standard for identifying which risks should be actionable. And there is no guarantee that

tort rules of liability, if they could be fashioned, would redistribute these risks in the most rational, economic way."

*Carolina Winds* at 87–88, 374 S.E.2d at 905–906.

For the reasons given above, I concur in the decision which answers question one in the negative, and which answers the second question in the affirmative. I dissent from that part of the opinion which answers question one "yes."

Acting Justice E.C. BURNETT, III, concurs.